Stephen A. McCartin (TX 13374700)
Mark C. Moore (TX 24074751)
Emily Shanks (TX 24110350)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
smccartin@foley.com
mmoore@foley.com
eshanks@foley.com

**PROPOSED COUNSEL TO DEBTOR**
**WELLFLEX ENERGY PARTNERS**
**FORT WORTH, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **WELLFLEX ENERGY PARTNERS** | § | **Case No.: 20-43267** |
| **FORT WORTH, LLC,** | § | |
| | § | |
| | § | |
| Debtor. | § | |

## DEBTOR'S RESPONSE TO FROST BANK'S OBJECTION TO DEBTOR'S SALE MOTION

Wellflex Energy Partners Fort Worth, LLC, as debtor and debtor-in-possession (the "**Debtor**") hereby files its *Response to Frost Bank's Objection to Debtor's Sale Motion* (the "**Response**"). In support of its Response, the Debtor states as follows:

# I.
## EXECUTIVE SUMMARY

- The Debtor has the following outstanding obligations[1]:

    Secured Lenders

    | | |
    |---|---|
    | - Simmons Bank | $1.847 |
    | - Subordinated Secured | $4.500 |
    | | $6.347 |

    Unsecured Creditors

    | | |
    |---|---|
    | - Frost Bank PPP Loan | $2.500 |
    | - Trade Creditors | $5.000 |
    | | $7.500 |

- The Debtor is liquidating all of its assets, and will not have sufficient assets to pay its Secured Lenders in full. Accordingly, the Debtor will have no assets available for distribution to general unsecured creditors.

- The Frost Bank PPP Loan is an unsecured loan, guaranteed by the SBA, but nevertheless only an unsecured loan. The Secured Lenders have liens on substantially all of the assets of the estate, and are legally entitled to all of the sale proceeds of their collateral until paid in full and before any excess unencumbered proceeds are available to general unsecured creditors. The PPP Loan is legally treated on a pari passu basis with all other general unsecured creditors.

- The Frost Bank PPP Note provides an event of default if the borrower "changes ownership" without prior lender approval. No change of ownership in the Debtor is occurring. The assets of the Debtor are being sold.

- The SBA has recently issued SBA Procedural Notice ("**SBA Guidance**") to PPP lenders which attempts to improperly modify or expand the change of control language of pre-existing PPP notes. The SBA Guidance for the first time attempts to expand "changes ownership" in the PPP note to include any sale of more than 50% of the assets of a borrower. The SBA Guidance then goes on to require PPP borrowers to escrow the outstanding amount of the PPP loan with the PPP lender (to be applied to any unforgiven amount of the general unsecured PPP loan) before the PPP lender/SBA will approve the sale.

---

[1] Defined terms are defined in Sections II and III of this Response.

- The SBA Guidance to its PPP lenders does not work for insolvent PPP loan borrowers.

  When applied to an insolvent borrower, the SBA Guidance improperly:

  a. attempts to expand the definition of an event of default under the Debtor's pre-existing PPP Note;

  b. attempts to "prime" senior secured liens by forcing the borrower to escrow the secured lender's collateral sale proceeds, which then must be applied exclusively to the unsecured obligation to the PPP lender; and

  c. attempts to prefer the general unsecured PPP loan obligation over other general unsecured loan obligations.

- Logically, insolvent borrowers should ignore this guidance issued by the SBA to its PPP lenders. A guidance from the SBA guarantor to it PPP lenders does not amend the terms of a pre-existing note. Failing to escrow the PPP loan amount, and failure to obtain PPP lender and/or SBA consent, even if required to avoid an event of default, merely creates an event of default under the unsecured note. The remedies for an event of default provided for under the note only allows acceleration of the debt. An insolvent borrower selling the secured lenders collateral should not be overly concerned with a default under an unsecured note. However, if ignored, (1) PPP lenders are concerned the SBA will renege on its guaranty; (2) borrowers are concerned that ignoring the escrow guideline might affect forgiveness of their PPP loans (which probably does not matter for insolvent liquidating borrowers); and (3) secured lenders are concerned the SBA might take some action against them for accepting the the sale proceeds (legally their collateral) if the borrower ignored the SBA escrow "guideline".

- Accordingly, the Debtor filed this Chapter 11 proceeding in part to request an order authorizing the sale with no PPP escrow, and authorizing the payment of its Secured Lenders' undisputed secured claims with the sale proceeds.

## II.
## BACKGROUND

1.     On October 22, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby initiating the above-captioned bankruptcy case and creating its bankruptcy estate (the "Estate").

2.     The Debtor continues to operate and to manage its business as "debtor-in-possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the above-captioned bankruptcy case (the "Chapter 11 Case") pursuant to

section 1104 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in the Chapter 11 Case at this time.

A.    **Description of the Debtor**

3.    The Debtor was founded in 2006. The Debtor engineers, designs, and prefabricates modular oil and gas production and processing equipment for sale and installation at the operator's well site. The Debtor utilizes a customized Modflex™ process to increase quality and efficiency by building and assembling the equipment in its facility. The Debtor's team is then available to install the equipment for essentially a "plug and play" system.

4.    This prefabrication production process allows operators of oil and gas wells to:

- reduce field construction time, thereby accelerating production from their wells;

- reduce the cost of field labor by up to 80%;

- enhance quality control; and

- provide standardized multi-well pad sites.

B.    **The Debtor's Capital Structure.**

5.    The Debtor has been capitalized through the following:

(i)    Senior Secured Loans from Simmons Bank in the aggregate outstanding amount of approximately $1.835 million, secured by first priority liens and security interests on substantially all of the Debtor's assets;

(ii)   Subordinated Secured Loans from the Debtor's equity security holders in the aggregate outstanding amount of approximately $4.210 million, secured by second priority liens and security interests on substantially all of the Debtor's assets;

(iii)  Unsecured "PPP loans" from Frost Bank in the amount of $2.500 million ($1.886 million of which is subject to loan forgiveness application under the PPP loan program); and

(iv)   General unsecured trade claims of approximately $5.000 million.

4840-0728-9554.1

C.     **The Debtor's Financial Difficulties**

6.     Like many companies in the oil field services industry, the Debtor's operations were deeply affected by the economic impact of a collapse in demand caused by the COVID-19 pandemic and the excess production initiated by Russia and Saudi Arabia that immediately preceded the pandemic. There has been an unprecedented drop in demand for oilfield services and dramatic declines in service pricing. Despite being well positioned with "major customers", the downward acceleration in overall drilling and completion activity have outpaced the defensive measures undertaken by the Debtor to reduce costs to keep the business viable. The decline in revenue has substantially reduced the Debtor's working capital and liquidity.

7.     The Debtor lacks the necessary liquidity to survive until the current economic crisis passes. With significantly fewer sales and reduced liquidity, the Debtor determined in the early summer of 2020 that it was unlikely to survive with the burden of its capital structure.

D.     **Sale of Assets and Cessation of Operations**

8.     Accordingly, in the early summer of 2020, the Debtor began an extensive process to market and sell its assets as a "going concern".

9.     On August 26, 2020, the Debtor entered into a non-binding letter of intent to sell substantially all of its assets as a "going concern". Regretfully, the "going concern" sale fell through, and the Debtor was forced to terminate most of its employees and to cease most of its business operations[2]. The Debtor sold its Rhome, Texas and White Settlement, Texas real property facilities in August 2020 (prior to the October 2, 2020 SBA Procedural Notice) to two (2) separate buyers for approximately $7,400,000, and used the net proceeds of the sale to repay

---

[2] The Debtor is continuing limited operations until Closing in order to preserve and continue working on a QEP purchase order which is being sold and assigned to the Purchaser pursuant to the Sale Motion.

4840-0728-9554.1

indebtedness due and owing to Simmons Bank. The Debtor sold its vehicles for approximately $300,000 in October 2020.

10. The Debtor then entered into a contract to sell most of its remaining assets to PetroSmith Equipment, LP for $2,200,000. The Debtor filed a "Sale Motion" contemporaneously with its bankruptcy petition. The Debtor proposes to sell substantially all of its assets to PetroSmith Equipment, LP for $2,200,000, subject to higher and/or better offers that may be received and accepted by the Debtor.

**E.    Frost Bank PPP Loan**

11. On April 15, 2020 the Debtor borrowed $2,501,500 from Frost Bank, evidence by the Paycheck Protection Program Promissory Note attached hereto as Exhibit A (the "**Note**," or "**PPP Loan**," or "**Frost Bank PPP Note**" or "**PPP Note**").

12. The Frost Bank Note is unsecured, and is guaranteed by the Small Business Administration pursuant to its Paycheck Protection Program ("**PPP**").

13. The PPP loan program was promulgated as part of the SBA's existing Section 7(a) loan program.

14. The events of default under the Frost Bank PPP Note include, but are not limited to:

      a.      failure to make required payments;

      b.      defaults on loans with other parties;

      c.      a bankruptcy filing;

      d.      if the borrower reorganizes, merges, consolidates, or otherwise "changes ownership or business structure," without the Lender's prior written consent. *See* Frost Bank Note, Section 10(a).

15. The Frost Bank PPP Note additionally outlines the remedies allowed to Frost Bank in the event of a default. In the event of a default, the Lender (Frost Bank) may accelerate

payment of the full balance of any amount outstanding under the note. *See* Frost Bank PPP Note, Section 11.

16.     The Frost Bank PPP Note clearly provides that an event of default occurs if the Borrower "changes ownership or business structure" without the Lender's consent. "Changes ownership" is not further defined in the PPP Note.

17.     There is no provision in the PPP Note declaring a sale of assets as an event of default if no lender consent is obtained.

**F.     SBA Procedural Notice**

18.     Apparently the change of control and lender consent requirement under the PPP loan program have created confusion by the PPP lenders and PPP borrowers. Accordingly, on October 2, 2020 the SBA attempted to clarify the confusion by issuing its "SBA Procedures Notice" to its PPP lenders, a copy of which is attached hereto as Exhibit B (the "**SBA Guidance**"). The new SBA Guidance to its PPP lenders cannot modify the terms and provisions of a pre-existing promissory note. Nevertheless, the SBA Guidance attempts to modify the change of control default provisions of pre-existing PPP notes. In addition, the SBA Guidance goes on to allow the PPP lender to consent to a sale of 50 percent or more of the borrowers' assets only if:

- the borrower escrows the outstanding amount of the PPP loan, and

- the escrowed amount is used to repay the unforgiven PPP loan amount or, if the escrow cannot be established,

- SBA approval is required <u>and</u> the Purchaser must assume the sellers PPP loan obligation to obtain SBA approval.

19. This SBA Guidance cannot work for an insolvent borrower with insufficient assets to pay its secured lenders. An insolvent seller cannot re-direct the Secured Lender's cash collateral sale proceeds for the payment of an unsecured PPP loan. This SBA Guidance cannot legally require the unsecured PPP loan to be paid in full, with priority and preference over other general unsecured creditors of an insolvent borrower.

20. The SBA Procedural Notice provides in part:

> "A PPP borrower may sell 50 percent or more of its assets (measured by fair market value) without the prior approval of SBA only if … an interest-bearing escrow account controlled by the PPP Lender is established with funds equal to the outstanding balance of the PPP loan. After the forgiveness process (including any appeal of SBA's decision) is completed, the escrow funds must be disbursed first to repay any remaining PPP loan balance plus interest." (emphasis added).

21. The SBA Procedural Notice goes on to provide that, if an escrow account cannot be established in the amount of the outstanding PPP loan amount:

> "…prior SBA approval of the change of ownership is required and the PPP Lender may not unilaterally approve the change of ownership;" and

> "SBA approval … will be conditioned on the purchasing entity assuming all of the PPP borrower's obligations under the PPP loan." (emphasis added)

## G. **Frost Bank Objection**

22. Frost Bank has objected to the Sale Motion and argues:

- the Debtor must escrow (from the Secured Lender's cash collateral) the unsecured PPP loan amount, and use that escrow for the payment of the unforgiven Frost Bank PPP Loan amount;

- if the Debtor cannot fund the escrow, the purchaser must assume the Debtor's PPP loan obligations.

# III.
# ARGUMENT

## A.     SBA Guidance Attempts to Create New Event of Default

23.     The Frost Bank PPP Loan provides that the Debtor is in default under the note if the Debtor "changes ownership or business structure" without the Lender's prior written consent. A sale of assets, where the ownership and structure of the borrower/seller is not changed, and where the PPP Loan is left with the borrower/seller, is not an event requiring prior lender consent to avoid an event of default.

24.     The SBA Guidance improperly attempts to modify the PPP Note by adding an event of default now defined as a sale of 50% or more of a borrower's assets (in one or more transactions) requiring PPP Lender consent, which then won't be provided without (i) an improper escrow of the secured lender's cash collateral for the payment of the PPP loan, and (ii) if used to pay the PPP loan, would clearly prefer the PPP lender over other unsecured creditors of an insolvent borrower.

## B.     The SBA Guidance Cannot Legally Prime Liens or Prefer PPP Loans

25.     The Frost Bank PPP Loan is unsecured. A default does not, and cannot legally provide the PPP lender with a priming lien over existing liens and, if sale proceeds exceed the secured debt, the SBA Guidance cannot legally provide the PPP loan with a priority in payment over other unsecured creditors.

26.     The Debtor does <u>not</u> need Frost Bank's approval to legally sell and transfer title to substantially all of its assets. If doing so creates a default under the unsecured note, so be it. Frost Bank has no legal right to ask a borrower, its Secured Lenders, or this Court to effectively allow it to "prime" the Secured Lender's liens by forcing the Secured Lender's cash collateral sale proceeds to be redirected to the payment of the PPP unsecured note. Even if the sale generated

proceeds in excess of the secured indebtedness, Frost Bank has no priority or right to be preferred over other general unsecured creditors.

## IV.
## PRAYER FOR RELIEF

27.     Accordingly, the Court should overrule the Frost Bank objection and approve the Sale Motion, with the proceeds of the sale distributed pursuant to federal and state priority distribution rights and priorities among the Debtor's creditors.


DATED: November 13, 2020                    Respectfully submitted by:

                                            */s/ Stephen A. McCartin*
                                            Mark C. Moore (TX 24074751)
                                            Stephen A. McCartin (TX 13374700)
                                            Emily Shanks (TX 24110350)
                                            **FOLEY & LARDNER LLP**
                                            2021 McKinney Avenue, Suite 1600
                                            Dallas, TX 75201
                                            Telephone: (214) 999-3000
                                            Facsimile:  (214) 999-4667
                                            mmoore@foley.com
                                            smccartin@foley.com
                                            eshanks@foley.com

                                            **PROPOSED COUNSEL TO DEBTOR
                                            WELLFLEX ENERGY PARTNERS FORT
                                            WORTH, LLC**

4840-0728-9554.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 13, 2020, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.

*/s/ Stephen A. McCartin*
Stephen A. McCartin

**EXHIBIT A**

**FROST BANK NOTE**



## PAYCHECK PROTECTION PROGRAM PROMISSORY NOTE

**Customer Number:** 5251

**SBA Loan Number:** 70-07

**Principal Amount:** $2,501,500.00

**SBA Approval Date:** 04/05/2020

**Effective Date:** 04/15/2020

### 1. AGREEMENT AND ACCEPTANCE

This Paycheck Protection Program Promissory Note ("Note") governs and evidences the Paycheck Protection Program Loan ("Loan") that **FROST BANK** ("Lender"), whose address is Frost Bank, P.O. Box 1600, San Antonio, TX 78296, is providing WELLFLEX ENERGY PARTNERS FORT WORTH, LLC

("Borrower"), whose address is 7609 WHITE SETTLEMENT ROAD, FORT WORTH, TX 76108-1902 .
The Loan is established under the terms and conditions of the Paycheck Protection Program of the United States Small Business Administration ("SBA") and the CARES Act (2020)(H.R. 748)(15 U.S.C 636 et seq.) (the "Act"). Borrower agrees to be bound by and comply with each and every following term and condition of this Note. Lender agrees, based on the terms and conditions and relying upon the representations and warranties set forth in this Note, to make available to Borrower the Loan as more fully described herein.

### 2. PROMISE TO PAY

Borrower promises to pay to FROST BANK, or order, in lawful money of the United States of America, the principal amount of Two million, five hundred one thousand, five hundred dollars ,
($ 2,501,500.00 ), together with interest on the unpaid principal balance thereof, from the Effective Date set forth above (the "Effective Date"), calculated as described in the "INTEREST CALCULATION METHOD" paragraph herein using an interest rate of 1.00% per annum based on a year of 365 days, until maturity.

### 3. INTEREST CALCULATION METHOD

Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (365 for all years, including leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

### 4. REPAYMENT

a. Subject to subparagraph (b) immediately below, Borrower will pay this loan in 17 equal principal payments of $138,972.22 and one final principal and interest payment of $139,078.83 . The Borrower's first principal payment is due on 11/15/2020 and all subsequent principal payments are due on the same day of each month after that. Interest will accrue at the rate specified herein beginning on the Effective Date of this Note. Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning 11/15/2020 with all subsequent interest payments to be due on the same day of each month after that. Borrower's final payment due on 04/15/2022 (the "Maturity Date") will be for all principal and all accrued interest not yet paid. Lender will apply each installment payment first to pay interest accrued to the date Lender received payment, then to bring principal current, and will apply any remaining balance to reduce principal. Notwithstanding anything to the contrary in this Note, any principal or interest due on a date that is not a customary business day shall be payable on the preceding business day.

b. As provided below, Borrower may apply for the Loan to be forgiven in whole or in part. If any portion of the principal and/or accrued interest is forgiven by Lender, then upon such forgiveness, the remaining balance of the loan will be reamortized over (i) the remaining term of this Note; or (ii) 18 months, as Lender may decide in its sole discretion, with the entire unpaid principal balance, along with accrued and unpaid interest, due and payable on the Maturity Date.

## 5. PERMISSIBLE USE

a. Borrower shall use the proceeds of the Loan only for purposes authorized by the Act, specifically the Paycheck Protection Program contained within such Act and subject to the certifications contained in that paragraph contained herein titled "Certifications and Authorizations".

b. In no event shall the proceeds of this Note be used for any transaction that is illegal or prohibited under any applicable law or governmental rule or regulation.

## 6. FORGIVENESS; REDUCTION

a. Subject to subparagraph (b) immediately below, the amount payable hereunder by Borrower will be reduced by the Forgivable Amount (as herein defined). The "Forgivable Amount" shall be such amount of the loan proceeds that Borrower shall have applied to qualifying forgivable purposes listed below, on the condition that (x) Borrower shall have provided to Lender documentation of such application of proceeds that meets the requirements of any guidance issued by the SBA (including but not limited to any Interim Final Rules promulgated by the SBA and/or published in the Federal Register), as determined by Lender in its sole and absolute discretion; (y) Borrower shall have maintained, and shall maintain, employee and compensation levels in accordance with any guidance issued by the SBA (including but not limited to any Interim Final Rules promulgated by the SBA and/or published in the Federal Register) as determined by Lender in its sole and absolute discretion; and (z) the calculation of such amount shall be further subject to the following paragraph; **provided, however, that any amount that Borrower requests to have forgiven that is challenged, disputed or denied by the SBA shall not be a Forgivable Amount or otherwise eligible for forgiveness by the Lender.**

b. The actual amount of loan forgiveness will depend, in part, on the total amount of payroll costs, payments of interest on mortgage obligations incurred before February 15, 2020, rent payments on leases dated before February 15, 2020, and utility payments under service agreements dated before February 15, 2020, over the eight-week period following the disbursement of the Loan. Not more than 25% of the loan forgiveness amount may be attributable to non-payroll costs

c. The following is an exhaustive list of qualifying forgivable purposes (each as set forth below and in further detail in the Act and in any Interim Final Rules promulgated by the SBA and/or published in the Federal Register):

1) payroll costs;
2) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;
3) for mortgage obligations that were incurred before February 15, 2020;
4) rent payments on leases dated and effective before February 15, 2020;
5) utility payments under service agreements dated and effective before February 15, 2020;
6) interest payments on any other debt obligations that were incurred before February 15, 2020; and/or
7) refinancing an SBA Economic Injury Disaster Loan ("EIDL") made between January 31, 2020 and April 3, 2020.

d. If Borrower has received one or more EIDL advances, the total amount of such advances shall be subtracted from the loan forgiveness amount.

## 7. NON-RECOURSE

Lender and SBA shall have no recourse against any individual shareholder, member or partner of Borrower for non-payment of the Loan, except to the extent that such shareholder, member or partner uses the loan proceeds for an unauthorized or unlawful purpose. For the avoidance of doubt, nothing in this paragraph shall be construed to alter, modify or waive the repayment or other obligations of a Borrower that is a sole proprietor, independent contractor, or otherwise eligible self-employed individual under this Note. Furthermore, Lender shall not have recourse for non-payment of the Loan against an individual religious leader with requisite authority signing this Note on behalf of an ecclesiastical or religious subdivision.



## 8. LATE CHARGES

For each payment of principal, interest, and/or fees which has not been paid in full within eleven (11) days after its date due, Borrower will pay to Lender a late charge of $15.00 or five percent (5%) of the unpaid portion, whichever is greater. Borrower acknowledges and agrees that the amount of this late fee is reasonable with respect to any such principal, interest, and/or fees, taking into account Lender's expectation of timely receipt of payments with regard to the favorable pricing of this Loan, and the operational, administrative and regulatory burdens resulting from late payments and delinquencies. To the extent this late fee or any other fee or charge set forth in this Note may be prohibited or may exceed any limit provided by any present or future applicable law, such fee or charge shall be reduced to the maximum amount allowed.

## 9. PREPAYMENT

Borrower may prepay principal of the Loan at any time without penalty. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must: (a) provide Lender written notice; (b) pay all accrued interest; and (c) if the prepayment is received less than 21 days from the date Lender received the notice, pay an amount equal to 21 days interest from the date Lender received the notice, less any interest accrued during the 21 days and paid under (b) of this paragraph. If Borrower does not prepay within thirty (30) days from the date Lender received the notice, Borrower must provide Lender a new notice.

## 10. DEFAULT

a. There shall have occurred a default (a "Default") under this Note if Borrower:

1) Fails to make any payment when due under this Note;
2) Breaches the terms of this Note in any way, including but not limited to failure to do anything required under this Note;
3) Defaults under the terms of any other obligation to Lender;
4) Does not disclose, or anyone acting on Borrower's behalf does not disclose, any material fact to Lender or SBA;
5) Makes, or anyone acting on Borrower's behalf makes, a materially false or misleading representation to Lender or SBA at any time;
6) Defaults on any loan or agreement with another creditor;
7) Fails to pay any taxes when due;
8) Becomes the subject of a proceeding under any bankruptcy or insolvency law;
9) Has a receiver or liquidator appointed for any part of its business or property;
10) Makes an assignment for the benefit of creditors;
11) Has any change in financial condition or business operation that Lender believes may adversely affect Borrower's ability to pay this Note;
12) Reorganizes, merges, consolidates, or otherwise changes ownership or business structure, without Lender's prior written consent;
13) Makes any distribution of Borrower's assets that would adversely affect Borrower's financial condition, or transfers (including pledging) or disposes of any assets, except in the ordinary course of business, without Lender's prior written consent.
14) Becomes the subject of a civil or criminal action that Lender believes may adversely affect Borrower's ability to pay this Note;
15) Has payments on the Loan returned or reversed for any reason; or
16) Fails to submit required information to Lender that Lender deems necessary in its sole discretion.

b. If there shall occur a Default specified in the preceding clause 6, 7, 8, 9, 10, 11, 12, 13 or 14, then Borrower shall give notice to Lender within five (5) business days of the occurrence thereof; provided that Borrower's failure to give such notice shall not preclude the finding of a Default under such provision.

## 11. REMEDIES

a. In the event of any Default or failure to meet any condition under this Note or comply with any term hereof, or upon any termination of the Loan, Lender may, at its option without waiving any of its rights hereunder, at law or at equity, or otherwise:

1) suspend the funding, advancement or disbursement of any and all loans (including the Loan) made by Lender to Borrower;

2) accelerate payment of the full balance on any or all loans made by Lender to Borrower, including but not limited to amounts outstanding under this Note, and thereby require immediate payment of the full balance, including, without limitation any interest, charges or fees of any kind due to Lender;

3) collect all amounts owing from Borrower to Lender;

4) file suit and obtain judgment;

5) exercise its right of setoff against any obligation Lender owes to Borrower, including a set-off to the extent permitted by law against any deposit account(s) Borrower may have with Lender;

6) release anyone obligated to pay this Note, without notice and without Borrower's consent; or

7) incur expenses to collect amounts due under this Note or enforce the terms of this Note or any document signed in connection with the Note, without notice and without Borrower's consent.

b. Without limitation of the foregoing, if there shall occur any Default specified in subsection (8), (9) or (10) of Section 10.a., then all principal and interest outstanding under this Note shall thereupon be immediately due and payable, without any further notice of default, notice of acceleration or other notice of any kind from Lender to Borrower, all of which Borrower hereby expressly waives.

## 12. ATTORNEY'S FEES AND COSTS

Borrower agrees to pay Lender's attorney's fees and costs: (a) related to this Note; or (b) related to enforcing the terms of this Note against Borrower; or (c) related to collecting any amounts due under this Note from Borrower.

## 13. LAWS GOVERNING THIS AGREEMENT

Subject to the paragraph herein titled "Small Business Administration (SBA)", this Note and the Loan will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the law of the State of Texas without regard to its conflicts of law provisions.  If any part of this Note cannot be enforced, this fact will not affect the rest of this Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Notwithstanding anything to the contrary, this Note shall not require or permit the payment, taking, reserving, receiving, collection, or charging of any sums constituting interest that exceed any maximum amount of interest permitted by applicable law. Any such excess interest shall be credited against the then unpaid principal balance or refunded to Borrower. Without limiting the foregoing, all calculations to determine whether interest exceeds the maximum amount allowed by applicable law shall be made by amortizing, pro-rating, allocating, and spreading such sums over the full term of the Loan.

## 14. CHOICE OF VENUE; WAIVER OF RIGHT TO TRIAL BY JURY

If there is a lawsuit involving this Note or any other document executed in connection therewith, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Bexar County, State of Texas.

**BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT TO ENFORCE THIS AGREEMENT, TO COLLECT DAMAGES FOR THE BREACH OF THIS AGREEMENT, OR WHICH IN ANY OTHER WAY ARISE OUT OF, ARE CONNECTED TO OR ARE RELATED TO THIS AGREEMENT OR THE SUBJECT MATTER OF THIS AGREEMENT. ANY SUCH ACTION SHALL BE TRIED BY THE JUDGE WITHOUT A JURY.**

### 15. CERTIFICATIONS AND AUTHORIZATIONS

a. By signing this Note, Borrower hereby ratifies each and every certification and/or authorization (i) required for participation in the Paycheck Protection Program, as set forth in the Act or in any Interim Final Rules promulgated by the SBA and/or published in the Federal Register, or (ii) made in the Paycheck Protection Program "Borrower Application Form" (SBA Form 2483 04/20, hereinafter the "Application") submitted by Borrower or its authorized representative to Lender in connection with the Loan, and agrees that all such certifications and/or authorizations are valid, true and correct as of the date of this Note, and that no answers provided by Borrower or on its behalf in the Application have changed in a manner that would render the Borrower ineligible to participate in the Paycheck Protection Program.

b. Furthermore, Borrower certifies that proceeds of the Loan will be used as specified below:

 $2,501,500.00   for payroll costs and payments on mortgage interest, rent, utilities and interest on other debt obligations (provided that at least 75% of this amount shall be used for payroll costs), as defined in the Act and in any Interim Final Rules promulgated by the SBA and/or published in the Federal Register

 $0.00        to refinance eligible SBA Economic Injury Disaster (EIDL) Loan No. (Disbursed directly to SBA)

c. By signing this Note, Borrower also hereby certifies and acknowledges that:

    (i)   If Borrower defaults on the Loan, SBA may be required to pay Lender under the SBA guarantee, and SBA may then seek recovery of the Loan from Borrower (to the extent any balance remains after loan forgiveness set forth above); and

    (ii)  Borrower shall keep books and records in a manner satisfactory to Lender, furnish financial statements as requested by Lender, and allow Lender and SBA to inspect and audit books, records and papers relating to Borrower's financial or business condition

### 16. SUCCESSOR AND ASSIGNS; CONSENT TO SALE OF LOAN

a. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns; provided, however, that Borrower shall not be permitted to assign to any other party its interest in or any benefits or obligations under this Note without Lender's prior written consent.

b.  In addition, Borrower and Lender agree: (i) Lender may sell, assign or transfer all or part of this Loan to one or more purchasers, assignees or transferees, including but not limited to SBA, without notice to or consent of Borrower; (ii) Lender may provide to any purchaser or potential purchaser any information or knowledge Lender may have about the parties or about any other matter relating to this Loan, without notice, and the Borrower waives any rights to privacy it may have with respect to such matters; and (iii) the assignee, purchaser or transferee of a Loan will be considered its absolute owner and will have all the rights granted under this Note or agreements governing the sale, assignment or transfer of the Loan.

### 17. SMALL BUSINESS ADMINISTRATION (SBA)

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

## 18. FACSIMILE AND COUNTERPARTS

This document may be signed in any number of separate copies, each of which shall be effective as an original, but all of which taken together shall constitute a single document. This Note, and any application submitted in connection with this Note or the Loan by the Borrower, shall be valid, binding, and enforceable against a Party (as defined in the paragraph titled "Final Agreement" herein) when executed by an authorized individual on behalf of the Party by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. In instances where this Note is signed electronically the Borrower agrees that such version shall be treated as a "transferable record" under the applicable enactment of the Uniform Electronic Transactions Act.

## 19. FINAL AGREEMENT

The persons and entities signing below ("Party", or collectively, the "Parties") acknowledge and agree that each Party's execution of this Note constitutes acknowledgment that such Party (a) agrees that there are no oral agreements relating to this Note, (b) agrees that agreements will be binding upon Lender only if in writing and signed by Lender, and (c) acknowledges receipt of the following Notice, and to the fullest extent allowed by law, agrees to be bound by the terms of this Note and this Notice.

**NOTICE: THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THIS LOAN CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS LOAN.**

## 20. GENERAL PROVISIONS.

a. All individuals signing this Note in their individual capacity and all entities signing this Note are jointly and severally liable.

b. Time is of the essence in performance of this Note.

c. Borrower waives all suretyship defenses.

d. Borrower must sign all documents necessary at any time to comply with this Note.

e. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without waiving or giving up any of them.

f. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

g. If any part of this Note is unenforceable, all other parts remain in effect.

h. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor.

i. Borrower agrees that it shall promptly sign and deliver to Lender an amended and restated form of this Note, to the extent such a modified or revised form is required to comply with any requirement of the Act, the Paycheck Protection Program, or any other SBA requirement, as determined by Lender in its sole discretion.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.]



By signing below, each individual or entity becomes obligated as Borrower.

Borrower:                                          :

By     *Nick Klaus*
    DocuSigned by:
    606D0EE94A0249B...

Name  Nick Klaus

Title  President

Frost

# DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer |
|---|---|---|---|---|---|---|
| $2,501,500.00 | 04/15/2020 | 04/15/2022 | 9998 | 5O0 / 6083 | [redacted]5251 | 030 |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** WELLFLEX ENERGY PARTNERS FORT WORTH, LLC
7609 WHITE SETTLEMENT ROAD, FORT WORTH, TX 76108-1902

**Lender:** **Frost Bank**
**P.O. Box 1600**
**San Antonio, TX 78296**

---

**Loan Type.** This is a non-precomputed Fixed Rate (1.000%) Nondisclosable Principal+Interest loan to WELLFLEX ENERGY PARTNERS FORT WORTH, LLC for $2,501,500.00 due on 04/15/2022 .

**Primary Purpose of Loan.** The primary purpose of this loan is for:

☐ **Personal, Family or Household Purposes.** ☐ **Personal Investment.** ☒ **Business, Agricultural and All Other.**

**Specific Purpose.** The specific purpose of this loan is: Paycheck Protection Program

**Disbursement Instructions:** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $2,501,500.00 as follows:

| | |
|---|---|
| **Amount paid to Borrower directly, Deposited to Checking Account #** [redacted]0093 | : $2,501,500.00 |
| **Amount paid to SBA directly, Refinance of EIDL Loan Number** | : $0.00 |
| **Note Principal:** | $2,501,500.00 |

**Automatic Payments.** Borrower hereby authorizes Lender automatically to deduct from Borrower's Demand Deposit – Checking Account, numbered [redacted]0093 , the amount of any loan payment. If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payments. At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**Financial Condition. BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT. THIS AUTHORIZATION IS DATED** 04/15/2020 **.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.]



By signing below, each individual or entity becomes obligated as Borrower.

Borrower:



By

Name  Nick Klaus

Title  President

DocuSign Envelope ID: D157CDB5-263F-4A18-9FC4-DBEE64ADDE8F

2

**EXHIBIT B**

**SBA GUIDANCE**



# SBA Procedural Notice

**TO:** All SBA Employees and Paycheck Protection Program Lenders

**SUBJECT:** Paycheck Protection Program Loans and Changes of Ownership

**CONTROL NO.:** 5000-20057

**EFFECTIVE:** October 2, 2020

The purpose of this Notice is to provide information concerning the required procedures for changes of ownership of an entity that has received Paycheck Protection Program (PPP) funds (a "PPP borrower").

For purposes of the PPP, a "change of ownership" will be considered to have occurred when (1) at least 20 percent of the common stock or other ownership interest of a PPP borrower (including a publicly traded entity) is sold or otherwise transferred, whether in one or more transactions,[1] including to an affiliate or an existing owner of the entity, (2) the PPP borrower sells or otherwise transfers at least 50 percent of its assets (measured by fair market value), whether in one or more transactions, or (3) a PPP borrower is merged with or into another entity.

Regardless of any change of ownership, the PPP borrower remains responsible for (1) performance of all obligations under the PPP loan, (2) the certifications made in connection with the PPP loan application, including the certification of economic necessity, and (3) compliance with all other applicable PPP requirements. Additionally, the PPP borrower remains responsible for obtaining, preparing, and retaining all required PPP forms and supporting documentation and providing those forms and supporting documentation to the PPP lender or lender servicing the PPP loan (referred to as the "PPP Lender" in this Notice) or to SBA upon request.[2] SBA reserves

---

[1] For purposes of determining a change of ownership, all sales and other transfers occurring since the date of approval of the PPP loan must be aggregated to determine whether the relevant threshold has been met. For publicly traded borrowers, only sales or other transfers that result in one person or entity holding or owning at least 20% of the common stock or other ownership interest of the borrower must be aggregated.

[2] If the buyer or the seller (or both) has an outstanding PPP loan, and the change of ownership transaction is financed in whole or in part with a 7(a) loan, all SBA Loan Program Requirements, as defined in 13 CFR 120.10, must be met. In addition, if an escrow account is required under the procedures set forth in this Notice, the 7(a) loan that finances the change of ownership cannot be used to finance the escrow account.

**PAGE 1 of 5**        **EXPIRES: 10/1/21**

SBA Form 1353.3 (4-93) MS Word Edition; previous editions obsolete

Must be accompanied by SBA Form 58



Federal Recycling Program    Printed on Recycled Paper

all rights and remedies available under the law in the event of fraud, false statements, and/or unauthorized uses of PPP loan proceeds.

Prior to the closing of any change of ownership transaction, the PPP borrower must notify the PPP Lender in writing of the contemplated transaction and provide the PPP Lender with a copy of the proposed agreements or other documents that would effectuate the proposed transaction.

There are different procedures depending on the circumstances of the change of ownership, as set forth below. In all cases, the PPP Lender is required to continue submitting the monthly 1502 reports until the PPP loan is fully satisfied.

1. **The PPP Note is fully satisfied**. There are no restrictions on a change of ownership if, prior to closing the sale or transfer, the PPP borrower has:

   a. Repaid the PPP Note in full; or

   b. Completed the loan forgiveness process in accordance with the PPP requirements and:

      i. SBA has remitted funds to the PPP Lender in full satisfaction of the PPP Note; or

      ii. The PPP borrower has repaid any remaining balance on the PPP loan.

2. **The PPP Note is not fully satisfied**. If the PPP Note is not fully satisfied prior to closing the sale or transfer, the following applies:

   a. *Cases in which SBA prior approval is not required*. If the following conditions are met for (i) a change of ownership structured as a sale or other transfer of common stock or other ownership interest or as a merger; or (ii) a change of ownership structured as an asset sale, the PPP Lender may approve the change of ownership and SBA's prior approval is not required:

      i. **Change of ownership is structured as a sale or other transfer of common stock or other ownership interest or as a merger**. An individual or entity may sell or otherwise transfer common stock or other ownership interest in a PPP borrower <u>without</u> the prior approval of SBA only if:

         a) The sale or other transfer is of 50% or less of the common stock or other ownership interest of the PPP borrower[3]; or

         b) The PPP borrower completes a forgiveness application reflecting its use of all of the PPP loan proceeds and submits it, together with any required supporting documentation, to the PPP Lender, and an interest-bearing

---

[3] In determining whether a sale or other transfer exceeds this 50% threshold, all sales and other transfers occurring since the date of approval of the PPP loan must be aggregated.

**PAGE 2 of 5**                                                              **EXPIRES: 10/1/21**

SBA Form 1353.3 (4-93) MS Word Edition; previous editions obsolete

Must be accompanied by SBA Form 58


Federal Recycling Program    Printed on Recycled Paper

escrow account controlled by the PPP Lender is established with funds equal to the outstanding balance of the PPP loan. After the forgiveness process (including any appeal of SBA's decision) is completed, the escrow funds must be disbursed first to repay any remaining PPP loan balance plus interest.

In any of the circumstances described in a) or b) above, the procedures described in paragraph #2.c. below must also be followed.

   ii. **Change of ownership is structured as an asset sale**. A PPP borrower may sell 50 percent or more of its assets (measured by fair market value) <u>without</u> the prior approval of SBA only if the PPP borrower completes a forgiveness application reflecting its use of all of the PPP loan proceeds and submits it, together with any required supporting documentation, to the PPP Lender, and an interest-bearing escrow account controlled by the PPP Lender is established with funds equal to the outstanding balance of the PPP loan. After the forgiveness process (including any appeal of SBA's decision) is completed, the escrow funds must be disbursed first to repay any remaining PPP loan balance plus interest. The PPP Lender must notify the appropriate SBA Loan Servicing Center of the location of, and the amount of funds in, the escrow account within 5 business days of completion of the transaction.[4]

b. *Cases in which SBA prior approval is required*. If a change of ownership of a PPP borrower does not meet the conditions in paragraph #2.a. above, prior SBA approval of the change of ownership is required and the PPP Lender may not unilaterally approve the change of ownership.

To obtain SBA's prior approval of requests for changes of ownership, the PPP Lender must submit the request to the appropriate SBA Loan Servicing Center. The request must include:

   i. the reason that the PPP borrower cannot fully satisfy the PPP Note as described in paragraph #1 above or escrow funds as described in paragraph #2.a above;

   ii. the details of the requested transaction;

   iii. a copy of the executed PPP Note;

   iv. any letter of intent and the purchase or sale agreement setting forth the responsibilities of the PPP borrower, seller (if different from the PPP borrower), and buyer;

---

[4] To find the appropriate SBA Loan Servicing Center, see https://www.sba.gov/document/sop-50-57-7a-loan-servicing-and-liquidation, Chapter 2.

**PAGE 3 of 5**                                                   **EXPIRES: 10/1/21**

SBA Form 1353.3 (4-93) MS Word Edition; previous editions obsolete

Must be accompanied by SBA Form 58



Federal Recycling Program    Printed on Recycled Paper

    v.   disclosure of whether the buyer has an existing PPP loan and, if so, the SBA loan number; and

    vi.   a list of all owners of 20 percent or more of the purchasing entity.

If deemed appropriate, SBA may require additional risk mitigation measures as a condition of its approval of the transaction.

SBA approval of any change of ownership involving the sale of 50 percent or more of the assets (measured by fair market value) of a PPP borrower will be conditioned on the purchasing entity assuming all of the PPP borrower's obligations under the PPP loan, including responsibility for compliance with the PPP loan terms. In such cases, the purchase or sale agreement must include appropriate language regarding the assumption of the PPP borrower's obligations under the PPP loan by the purchasing person or entity, or a separate assumption agreement must be submitted to SBA.

SBA will review and provide a determination within 60 calendar days of receipt of a complete request.

c.   ***For all sales or other transfers of common stock or other ownership interest or mergers, whether or not the sale requires SBA's prior approval***. In the event of a sale or other transfer of common stock or other ownership interest in the PPP borrower, or a merger of the PPP borrower with or into another entity, the PPP borrower (and, in the event of a merger of the PPP borrower into another entity, the successor to the PPP borrower) will remain subject to all obligations under the PPP loan. In addition, if the new owner(s) use PPP funds for unauthorized purposes, SBA will have recourse against the owner(s) for the unauthorized use.

If any of the new owners or the successor arising from such a transaction has a separate PPP loan, then, following consummation of the transaction: (1) in the case of a purchase or other transfer of common stock or other ownership interest, the PPP borrower and the new owner(s) are responsible for segregating and delineating PPP funds and expenses and providing documentation to demonstrate compliance with PPP requirements by each PPP borrower, and (2) in the case of a merger, the successor is responsible for segregating and delineating PPP funds and expenses and providing documentation to demonstrate compliance with PPP requirements with respect to both PPP loans.

The PPP Lender must notify the appropriate SBA Loan Servicing Center, within 5 business days of completion of the transaction, of the:

    i.   identity of the new owner(s) of the common stock or other ownership interest;

    ii.   new owner(s)' ownership percentage(s);

    iii.   tax identification number(s) for any owner(s) holding 20 percent or more of the equity in the business; and

---

**PAGE 4 of 5**                                          **EXPIRES: 10/1/21**

SBA Form 1353.3 (4-93) MS Word Edition; previous editions obsolete

Must be accompanied by SBA Form 58

 Federal Recycling Program    Printed on Recycled Paper

  iv. location of, and the amount of funds in, the escrow account under the control of the PPP Lender, if an escrow account is required.

**PPP Loans Pledged in Paycheck Protection Program Liquidity Facility (PPPLF)**

If a PPP loan of a PPP borrower associated with a change of ownership transaction was pledged by the PPP lender to secure a loan under the Federal Reserve's PPPLF, the lender is reminded to comply with any notification or other requirements of the PPPLF.

Questions:

Questions concerning this Notice may be directed to the Lender Relations Specialist in the local SBA Field Office, which can be found at https://www.sba.gov/tools/local-assistance/districtoffices.

Dianna L. Seaborn
Director
Office of Financial Assistance

---

**PAGE 5 of 5**            **EXPIRES: 10/1/21**

SBA Form 1353.3 (4-93) MS Word Edition; previous editions obsolete

Must be accompanied by SBA Form 58



Federal Recycling Program  Printed on Recycled Paper